IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BALTIMORE SCRAP CORP.,
*Plaintiff*

v.

RLI INSURANCE CO.,
*Defendant.*

Civil Action No. ELH-18-2743

**MEMORANDUM OPINION**

In this insurance dispute, plaintiff Baltimore Scrap Corporation ("Baltimore Scrap"), a scrap metal recycling business, filed suit against Executive Risk Specialty Insurance Company ("Executive Risk") and RLI Insurance Company ("RLI") on September 5, 2018, alleging breach of contract under all-risk insurance policies. ECF 1 (the "Complaint"). The Complaint asserts claims that RLI (Count I) and Executive Risk (Count II) wrongfully denied coverage "for a series of thefts" that occurred in one of plaintiff's scrap yards. *Id.* ¶¶ 31-44.[1]

RLI answered the suit on March 7, 2019. ECF 24. Executive Risk moved to dismiss the suit pursuant to Fed. R. Civ. P. 12(b)(6), alleging that the suit was untimely under Maryland's three-year statute of limitations, set forth in Md. Code (2013 Repl. Vol., 2018 Supp.), § 5-101 of the Courts and Judicial Proceedings Article ("C.J."). ECF 16. By Memorandum Opinion and Order of April 26, 2019, the Court dismissed the suit as to Executive Risk. ECF 26; ECF 27.

Now pending is plaintiff's "Motion for Partial Summary Judgment." ECF 46 (the "Baltimore Scrap Motion"). It is supported by seven exhibits. ECF 46-2 to ECF 46-8. RLI opposes the Baltimore Scrap Motion and has filed a cross-motion for summary judgment. ECF

_____

[1] Subject matter jurisdiction is founded on diversity of citizenship, pursuant to 28 U.S.C. § 1332. ECF 1, ¶ 5.

48.   That motion is supported by a memorandum of law (ECF 48-1) (collectively, the "RLI

Motion") and five exhibits.   ECF 48-3 to ECF 48-7.   Baltimore Scrap filed a combined opposition

to the RLI Motion and a reply in support of its own summary judgment motion.   ECF 51

("Baltimore Scrap Reply").   It also filed eight additional exhibits.   ECF 51-1 to ECF 51-8.   RLI

has replied.   ECF 52 ("RLI Reply").

The motions are fully briefed, and no hearing is necessary to resolve them.   *See* Local Rule

105.6.   For the reasons that follow, I shall deny the Baltimore Scrap Motion and grant the RLI

Motion.

### I.     Factual Background[2]

### A.  Procedural Background

The Court issued a Scheduling Order on May 23, 2019.   ECF 29.   Among other things, it

set a discovery deadline of December 2, 2019, and a deadline of January 6, 2020, for dispositive

pretrial motions.   *Id.* at 1.

On October 21, 2019, well before the discovery deadline set in the Scheduling Order (ECF

29), Baltimore Scrap filed a motion for partial summary judgment as to RLI.   *See* ECF 35.   RLI

did not timely respond.   *See* Docket.   However, months later, on March 11, 2020, RLI sought leave

to file an opposition as well as a cross-motion for summary judgment.   ECF 37.   It also filed a

"Consent Motion to Modify/Reset the Scheduling Order."   ECF 38.   In ECF 38, RLI asked for

additional time to respond to plaintiff's summary judgment motion and to "conduct limited

discovery of the Plaintiff."   *Id.* ¶ 9.   By Order of March 12, 2020 (ECF 39), I denied as premature

plaintiff's motion for partial summary judgment (ECF 35).   And, I denied as moot RLI's motion

---

[2] The Court cites to the electronic pagination, which does not always correspond to the page
number imprinted on the submission.

for leave to file an opposition (ECF 37) and granted what I thought was a consent motion to modify the schedule (ECF 38).

Plaintiff subsequently filed a "Motion for Reconsideration." ECF 40. It expressed opposition to the scheduling motion (ECF 38) and disputed that it had ever consented, despite the representation of RLI in ECF 38. *Id.* Accordingly, I issued an Order on April 29, 2020 (ECF 42), directing RLI to respond to ECF 40 by May 28, 2020. RLI failed to do so. *See* Docket. Accordingly, I issued another set of deadlines for discovery and the filing of dispositive motions. ECF 45. The Baltimore Scrap Motion followed on July 8, 2020. ECF 46.

### B.   The Theft Scheme

The material facts of the case are largely undisputed. See ECF 46 at 2-5 ("Undisputed Material Facts"); ECF 48-1 at 7-9 ("Statement of Undisputed Facts").

Baltimore Scrap is a scrap metal recycling company with locations throughout Maryland. ECF 1, ¶ 7. It "purchases scrap metal from industry, government, auto salvage yards, demolition contractors, and farms, as well as from the general public." *Id.* According to James Burnett, plaintiff's Chief Financial Officer ("CFO"), the company's Baltimore facility buys both "ferrous metal and material that contains both ferrous and non-ferrous metal." ECF 51-7 (Declaration of James Burnett); *but see* ECF 48-5 (Civil Trial Transcript, dated March 4, 2016) at 4, Tr. 21-22 (James Ross, scrap purchasing manager for Baltimore Scrap, explaining that the company only deals with ferrous metals).

Baltimore Scrap purchases scrap from customers in various ways. According to Baltimore Scrap, one method involves a customer driving into the facility, where his or her vehicle is weighed. The customer then unloads the metal at a particular site in the scrap yard, for purchase by plaintiff. ECF 51-1 (Initial Claim Email of 2/2/2015) at 4; ECF 48-4 at 20, Tr. 1-12. Then, the

customer returns to the scale, where his vehicle is weighed without the material on it.  *Id.*  The customer receives a ticket with a value that is based on the type of material in the load and the weight difference of the vehicle.  *Id.*  The customer then signs one part of the ticket and gives it back to the Baltimore Scrap employee at the scale and scans the other part of the ticket at an ATM on the site, where a cash payment is dispensed.  *Id*.

On October 24, 2014, a Baltimore Scrap employee discovered that Kenneth Grimes, "a regular customer," ECF 46 at 2, was "pretending to sell scrap metal" to plaintiff and then collecting payment "from an un-manned ATM" located on plaintiff's premises, "without actually providing any scrap metal."  ECF 46-2 (RLI's Declination Letter) at 2.  In particular, Grimes falsely represented that he was selling metal at Baltimore Scrap's main facility on Vera Street in Baltimore.  ECF 51-1 at 3-4; ECF 46-2 at 1.

Grimes, an employee of Otis Elevator ("Otis")[3] from 2011 through 2014 (ECF 48-5 at 3, Tr. 19-20), "would arrive at the Baltimore Scrap Corporation location with a truckload of metal," *i.e.*, elevator counter-weights, and he "went through the process to weigh his truck and load, left the premises and dropped of[f] the counter-weights at another location, returned with an empty truck to be weighed, and then collected money from the un-manned Baltimore Scrap Corporation ATM for the weight of the metal that he pretended to provide."  ECF 46-2 at 2-3.  At the end of each transaction, Grimes would sign the ticket that he scanned at the ATM ostensibly on behalf of his employer, Otis.  ECF 51-1 at 2.  And, he made it appear as if he had deposited the load of scrap in the yard when, in actuality, he had left it elsewhere.  *Id.*

---

[3] The parties refer to Otis as Otis Elevator, Otis Technology, and Otis Corporation in different motions and exhibits.  Because the plaintiff uses Otis Elevator in the Complaint, ECF 1, ¶ 11, the Court will also use that name.

After the Baltimore Scrap employee discovered the incident, Baltimore Scrap reviewed its security footage from a security camera that was installed in July 2014.  ECF 46-2 at 3; ECF 51-1 at 4; ECF 51-4 at 1-2.  The footage for a four-month period revealed that Grimes had committed the same act 23 times between July 30, 2014 and October 23, 2014.  *Id.*  In each video, Grimes was observed being weighed with a load of metal and then driving off the property with the material still in his vehicle.  *Id.*  Grimes obtained $23,013 in that period of time.  ECF 46-2 at 3.

Baltimore Scrap also reviewed its transaction history with Otis from January 2005 and identified all the tickets signed by Grimes.  ECF 51-1 at 5-14.  The tickets revealed that Grimes had been bringing scrap metal to the Baltimore Scrap facility since March 2011 and had obtained about $240,000 over the four-year period.  *Id.* at 2; ECF 48-4 at 47, Tr. 14-17; ECF 48-6 (Baltimore Scrap's Responses to RLI Requests for Admissions), ¶ 2.  Yet, according to Baltimore Scrap, Grimes never delivered any scrap material during this period.  ECF 48-4 at 47, Tr. 20-21.

In response to inquiries from Baltimore Scrap about these incidents, Otis indicated that it only received the cash for one ticket from Baltimore Scrap in 2014 and it was not one of the tickets that was signed by Grimes.  ECF 51-1 at 2; ECF 48-4 at 48, Tr. 15-19.  Moreover, Otis maintained that it never authorized Grimes to scrap any material and never received any payment from Grimes for the money that Grimes received from Baltimore Scrap.  ECF 48-6, ¶¶ 4-5.  Nor did Otis believe that any of its counter-weights were missing.  ECF 48-4 at 15, Tr. 13-20.

On December 5, 2014, the State of Maryland charged Grimes with theft of $23,013 for the 23 incidents that were captured on the security footage from July 30, 2014 to October 24, 2014.  *See* ECF 46-3 (Certified Copy of the Docket for the criminal conviction); *State of Maryland v. Kenneth Grimes*, 5B02279247 (Dist. Ct. Md. Balt. Cty.); ECF 46-2 at 3; ECF 48-4 at 47, Tr. 11-13.  Grimes was subsequently convicted and, as part of his sentence, the court ordered him to pay

restitution. *Id.* The restitution has since been paid and the amount is not part of plaintiff's claim to RLI. ECF 1, ¶ 12; ECF 48-4 (Testimony of James D. Burnett) at 26, Tr. 3-5; ECF 46-2 at 3.

Baltimore Scrap also brought a civil suit in State court against Grimes on May 19, 2015, alleging fraud, and seeking to recover for the incidents that occurred before July 2014. *See* ECF 46-4 (Docket, Complaint, and Judgment for the civil case); *Baltimore Scrap v. Grimes*, 24-C-15002598 (Circ. Ct. Balt. Cty.). At trial, Grimes admitted that after the initial weigh in, he would unload his truck somewhere else, then come back to Baltimore Scrap to have his truck weighed again to generate a sales ticket, with the goal of obtaining money from Baltimore Scrap without leaving any scrap metal at the yard. ECF 48-7 (Civil Trial transcript, dated March 7, 2016) at 3, Tr. 9-20. Other evidence established that Baltimore Scrap did not purchase any scrap metal from Grimes during the period in issue. *See*, *e.g.*, ECF 48-5 at 6, Tr. 14-15 (Testimony of Mr. Ross: "I don't believe [Baltimore Scrap] purchased any scrap metal.").

On March 7, 2016, a jury in the Circuit Court for Baltimore City found Mr. Grimes liable for fraud, and a judgment was entered against him in the amount of $196,081.05. ECF 46-4 at 9; *Baltimore Scrap v. Grimes*, 24-C-15002598 (Circ. Ct. Md. Balt. Cty. March 7, 2016). Mr. Grimes has begun making small payments on the judgment, which were excluded from plaintiff's claim against its insurer. ECF 1, ¶ 16; ECF 46 at 8 n.3.

## C. The Insurance Policy

Baltimore Scrap claims that, "at all relevant times," it was "covered under a comprehensive insurance program, including a Commercial Property Coverage Policy with RLI and a Crime Policy with Executive Risk." ECF 1, ¶ 18.[4]

---

[4] As noted, Executive Risk was dismissed from the suit on April 26, 2019 (ECF 27). Therefore, the Court will only consider Baltimore Scrap's policy with RLI.

For the period from October 1, 2012 to October 1, 2013, Baltimore Scrap was insured by RLI under Policy Number ILM0200150.  ECF 46-5 (the "Policy").  The Policy was subsequently renewed for the periods of 2013 to 2014 and 2014 to 2015.  ECF 48-6, ¶¶ 32-35.

Under the Policy, RLI promised to "cover risks of direct physical loss to covered property at a 'covered location' caused by a covered peril."  ECF 46-5 at 47.  One category of covered property is "**Covered Business Personal Property**," which is defined as "'your' business personal property in buildings or structures at a 'covered location' or in the open (or in vehicles) on or within 1,000 feet of a 'covered location.'"  *Id.* at 48.  Moreover, the Policy "cover[s] risks of direct physical loss unless the loss is limited or caused by a peril that is excluded."  *Id.* at 58.

Under the "**Property Not Covered**" section, the Policy provides, ECF 46-5 at 50: "**Money, Securities, Accounts, and Valuable Papers** – Except as provided elsewhere in this policy, 'we' do not cover 'money', 'securities', accounts, bills, and the cost to reproduce, replace, or restore 'valuable papers' and lost information."  And, in the definitions section, "money" is defined as "currency, bullion, coins, bank notes in current use, and traveler's checks, registered checks, and money orders held for sale to the public."  ECF 46-5 at 44.

Baltimore Scrap also purchased a "Coverage Extension" for "Fraud and Deceit."  In the section titled "**COVERAGE EXTENSIONS**" the Policy states, ECF 46-5 at 51:

> 5.      **Fraud and Deceit** – "We" pay up to $5,000 for "theft" of covered property when "you", "your" agents, customers, or consignees are fraudulently induced to part with the covered property:
>
>    a.      to persons who falsely represent themselves as the proper persons to receive the property; or
>
>    b.      by the acceptance of fraudulent bills of lading or shipping receipts.

The $5,000 limit for "Fraud and Deceit" was extended to $500,000 in Baltimore Scrap's policy with RLI.  ECF 46-5 at 36.

Another set of exclusions, under the "**Perils Excluded**" section, provides, in relevant part, ECF 46-5 at 63: "u. **Voluntary Parting** – Except as provided under Coverage Extensions – Fraud and Deceit, 'we' do not pay for loss caused by or resulting from voluntary parting with title to or possession of any property because of any fraudulent scheme, trick, or false pretense."

An endorsement titled "**Property Excluded**" states, ECF 46-5 at 73:  "This endorsement changes the policy" and it also says "**PLEASE READ THIS CAREFULLY**."  Further, it states, *id.*:

**PROPERTY NOT COVERED**

"We" do not cover the property described below:

Property of others for which "you" are responsible as a warehouseman, meaning one which stores property of others under a warehouse agreement or other contract for storage.

"Your" stock in trade OTHER THAN NONFERROUS METALS, including but not limited to Ferrous Metals, Cardboard, Paper, Plastics, Rubber, etc.

"Your" stock in trade of Gold, Silver, Platinum, Iridium, Palladium, Rhodium, Ruthenium, and Osmium, or alloys thereof, in any form.

Railroad Rolling Stock

And, another endorsement expressly provides:  "**THIS ENDORSEMENT CHANGES THE POLICY**.  **PLEASE READ IT CAREFULLY**."  *Id.* at 115.  Titled "**COMMERCIAL OUTPUT PROGRAM COVERAGE PART DEDUCTIBLE**," it provides for a $25,000 deductible, and greater deductibles as specified.  *Id.*

### D.  The Insured's Claim

On February 2, 2015, Baltimore Scrap submitted an insurance claim to RLI under the Policy for losses incurred as a result of Grimes's fraudulent scheme (the "Claim").  ECF 51-1.  The email with the initial claim included a memorandum detailing the incidents involving Grimes, a police report from October 24, 2014, and a chart of Baltimore Scrap's transaction history with Otis dating back to 2005.  *Id.*  The claim alleges that Baltimore Scrap lost approximatively $240,000 as a result of Grimes's conduct between 2011 and 2014.  *Id.*

RLI responded to Baltimore Scrap's Claim by letter of March 23, 2015.  ECF 51-2.  In the letter, RLI sent Baltimore Scrap a general reservation of rights, cited language from Baltimore Scrap's Policy, and advised that RLI was investigating the matter.  *Id.*  More specifically, RLI cited the Policy's provision on money as property not covered (ECF 46-5 at 50) and the coverage extension for fraud and deceit (ECF 46-5 at 51).  *Id.* at 3.

On April 9, 2015, RLI sent another letter to Baltimore Scrap, again reserving its rights and copying additional provisions from the Policy.  ECF 51-3 (Letter from RLI to Baltimore Scrap, dated April 9, 2015).  In addition to the Policy provisions cited in the letter of March 23, 2015, RLI referenced the provision on exclusion of losses resulting from "Voluntary Parting."  *Id.* at 4; *see* ECF 46-5 at 63.  RLI also cited the Policy's requirement for the insured to provide a "proof of loss," submit to "examination under oath," and produce records.  ECF 51-3 at 4.  And, RLI asked to examine James Burnett and Jeffrey Ross under oath and requested various categories of documents related to Baltimore Scrap's claim.  *Id.* at 4-5.  In addition, RLI requested a proof of loss statement.  *Id.*

Baltimore Scrap submitted the requested proof of loss statement to RLI on April 27, 2015.  ECF 46-6 (the "Statement").  Although plaintiff asserts that the actual cash value of the loss was

$240,000, the Policy with RLI did not begin until October 2012.  Therefore, in the Statement, Baltimore Scrap stated that the actual cash value of the property at the time of the loss, *i.e.*, after October 2012, was $162,426.  *Id.* at 2.  That sum reflects the amount of losses incurred after October 2012.  *See* ECF 48-4 at 44, Tr. 20-21; *id.* at 45, Tr. 1-8.  And, after deducting the reimbursement from  Grimes's restitution payments, Baltimore Scrap claimed a loss of $139,413. *Id.*  Further, after subtracting the deductible of $25,000, as provided by the Policy, Baltimore Scrap claimed $114,413 in damages due under the Policy.  *Id.*

RLI examined Mr. Burnett under oath on April 29, 2015, as part of its investigation.  *See* ECF 48-4.  Mr. Burnett explained that Baltimore Scrap's insurance broker, Commercial Insurance Associates, was not sure whether the Claim would be covered by the Policy.  ECF 48-4 at 30-31. And, if there was coverage under the Policy, then it would likely be under fraud coverage because it "was dollars involved as opposed to inventory."  *Id.* at 31, Tr. 3-5.  Mr. Burnett stated, *id.* at 31, Tr. 8-13: "Originally [the insurance brokers] were saying well, it's property.  If it's inventory you're not covered for that.  I'm like well, nobody stole inventory.  I have to have inventory for somebody to steal.  I never got anything.  What they got was money.  Oh, that's different, that works in your favor."  But, Mr. Burnett did not know how the insurance brokers came to that conclusion.  *Id.* at 32, Tr. 14-17.

In discussing Grimes's actions, Mr. Burnett noted that Grimes "didn't drop off any [material] for the period he was under review."  ECF 48-4 at 47, Tr. 20-21.  He also confirmed that "it's [the Baltimore Scrap] position we never received any of this material from Mr. Grimes." ECF 48-4 at 48, Tr. 18-19.  And, he recounted that Baltimore Scrap "went back to Otis Technology and they said that they didn't sell this material. And [also] the only ticket we got from Otis that got paid was in 5/14."  *Id.*

By letter dated September 10, 2015, RLI denied Baltimore Scrap's Claim on four grounds. ECF 46-2 ("Declaration Letter") at 3-5.  First, RLI stated that Baltimore Scrap "has not met its burden to establish that $139,413 was stolen from it in the applicable time period before July 2014…. Mr. Grimes was not criminally charged with theft for any of these alleged incidents and Baltimore Scrap Corporation has not produced evidence to establish that such amounts were stolen by Mr. Grimes."  *Id.* at 3.  Second, even if the alleged thefts occurred, "the theft was of 'money,' which is explicitly not covered under the policy" pursuant to the Policy section on "Property Not Covered."  *Id.* at 4.  Third, "the Perils Excluded portion of the [P]olicy…excludes coverage for the fraudulent scheme or false pretense involved with Mr. Grimes' alleged theft[.]"  *Id.* at 4 (quoting the Policy provision on "Voluntary Parting").  Finally, the "Fraud and Deceit Coverage Extension" is not applicable because "[i]n order for this Fraud and Deceit coverage to apply, the 'theft' must be of covered property" and "'money' is not covered property under the policy."  *Id.*  RLI also asserted the right to raise certain other defenses, including that each theft "may be considered a separate occurrence, which would give rise to a separate $25,000 deductible for each theft."  *Id.* at 5.

On December 22, 2016, Baltimore Scrap, through counsel, responded to the Declaration Letter.  ECF 46-7.  Counsel took "exception with many of the conclusions set forth in the letter." *Id.* at 2.  Baltimore Scrap's attorney asserted, *id.*: "From my review of the letter and the underlying facts, it appears that contrary to controlling law, RLI's investigation of this claim consisted of a review of facts and policy language in such a way as to avoid its coverage obligations."

Thereafter, Baltimore Scrap challenged each of RLI's reasons for the denial of coverage. First, in response to RLI's assertion that Baltimore Scrap did not meet its burden to establish that $139,413 was stolen, Baltimore Scrap claimed that it supplied RLI with "significant evidence

against Mr. Grimes" and an "accounting of the amount lost." *Id.* And, the civil judgment against Grimes, in the amount of $196,081.05, "confirms that RLI's denial of coverage based upon a purported lack of evidence as to the existence and amount of the loss was baseless." *Id.* at 2-3.

In response to RLI's contention that the theft was of money and thus not covered property, Baltimore Scrap explained that Grimes "did not steal money." *Id.* at 3. Rather, "Mr. Grimes committed fraud by removing property that Baltimore Scrap paid for." *Id.* Therefore, "[t]he materials taken from the Baltimore Scrap facility constituted covered 'property.'" *Id.* As to RLI's claim that the loss is excluded pursuant to the "Voluntary Parting" exclusion, Baltimore Scrap asserted that "[t]his exclusion only applies when an insured voluntary [sic] parts with possession of property. Baltimore Scrap did not voluntarily part with the scrap, it was removed from the Baltimore Scrap yard by Mr. Grimes without Baltimore Scrap's knowledge or consent." *Id.* And, Baltimore Scrap posited that, even if the "Voluntary Parting" exclusion applied to the Claim, the "exclusion does not apply to loss under the Fraud and Deceit extension of coverage." *Id.* In its view, the "Fraud and Deceit" extension applies because the theft was not of money. *Id.*

In conclusion, Baltimore Scrap argued that it was "forced to pursue and pay for the civil action against Mr. Grimes because RLI breached its coverage obligation." *Id.* Therefore, it concluded that RLI is liable to Baltimore Scrap "for the amount of theft by Mr. Grimes as confirmed by the civil judgment ($196,081.05) plus the attorney's fees ($55,198.58)." *Id.*

RLI refuted Baltimore Scrap's arguments in a letter dated February 21, 2017. *See* ECF 46-8. First, in response to Baltimore Scrap's claim that RLI was attempting to avoid its coverage obligation, RLI stated that it "received notice of this matter on February 2, 2015, and thereafter it conducted a thorough investigation of the facts surrounding the thefts," including "conducting Examinations under Oath of the owner and CFO of Baltimore [Scrap] to ensure all information

was collected for our consideration."  ECF 46-8 at 2.  And, "[p]rior to issuing its September 10, 2015 declination letter RLI… requested copies of additional information (i.e. correspondence between Baltimore [Scrap] and its insurance broker) but Baltimore advised those documents would not be provided.  Accordingly, a declination letter was issued based on the information available to RLI at that time."  *Id.*

Moreover, RLI maintained that Baltimore Scrap's letter "does not provide any new factual information or legal support that warrants any change in RLI's previous coverage declination." *Id.*  The fraud conviction against Mr. Grimes, RLI alleged, "does not change the fact that what he stole from Baltimore [Scrap] was money taken from the ATM based upon a fraudulent scheme that did not involve the actual delivery or theft of any scrap or 'property.'"  *Id.*

In this regard, RLI explained that its investigation revealed that "Mr. Grimes pretended to sell scrap metal to Baltimore, but he never actually sold or provided any scrap metal before taking money out of the un-manned ATM on the premises."  *Id.* at 3.  And, "the metal Mr. Grimes brought in for weighing was in the form of elevator counter-weights, which were not scrap and which he never had any intention of scrapping or dropping off at Baltimore."  *Id.*  Finally, RLI concluded, *id.* at 3:

> While Mr. Grimes has now been convicted of fraud with regard to the thefts that occurred prior to July 2014, and which were not captured on security video, no information has been provided to establish that his method of stealing from Baltimore was any different prior to the time it was captured on security video and/or that any scrap or "property" was ever actually taken or stolen from Baltimore by Mr. Grimes.

 Accordingly, RLI determined that plaintiff's loss was not covered under the Policy.

## II.   Legal Standards

### A.  Summary Judgment

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).  To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.  *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).  On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party

must prevail as a matter of law." *Anderson*, 477 U.S. at 252.  But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc*., 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party.  *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018);   *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton*

*Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  That said, "a party's 'self-serving opinion

... cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc*., 954 F.3d at

658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)).  In other words,

"[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v.

Graves-Humphreys Co*., 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co*., 499 F.

App'x 285, 294 (4th Cir. 2012).

When, as here, the parties have filed cross-motions for summary judgment, the court

"'consider[s] each motion separately on its own merits to determine whether either of the parties

deserves judgment as a matter of law.'"  *Def. of Wildlife v. N.C. Dep't of Transp*., 762 F.3d 374,

392 (4th Cir. 2014) (citation omitted). In doing so, the court "'resolve[s] all factual disputes and

any competing, rational inferences in the light most favorable to the party opposing that motion.'"

*Id.* at 393 (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003), *cert. denied*, 540

U.S. 822 (2003)); *see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Simply because both parties have filed for summary judgment does not mean that summary

judgment to one party or another is necessarily appropriate.  Rather, "[b]oth motions must be

denied if the court finds that there is a genuine issue of material fact."  10A C. WRIGHT, A. MILLER,

& M. KANE, FEDERAL PRACTICE & PROCEDURE § 2720 (4th ed. Suppl. 2020) (WRIGHT & MILLER).

### B.  Choice of Law

Jurisdiction is based on diversity of citizenship.  ECF 1, ¶ 5; *see* 28 U.S.C. § 1332.  When

a federal court sits in diversity, it must "apply the forum state's substantive laws, including its

choice of law rules."  *Small v. WellDyne, Inc*., 927 F.3d 169, 173 n.3 (4th Cir. 2019); *see Francis

v. Allstate Ins. Co*., 709 F.3d 362, 369 (4th Cir. 2013); *CACI Int'l, Inc. v. St. Paul Fire & Marine

Ins. Co*., 566 F.3d 150, 154 (4th Cir. 2009); *Colgan Air, Inc. v. Raytheon Aircraft Co*., 507 F.3d

270, 275 (4th Cir. 2007); *see also* WRIGHT & MILLER, § 4501.  Maryland is, of course, the forum

state.  Therefore, I shall apply Maryland's choice of law rules.

Under Maryland's choice-of-law principles for contract claims, Maryland follows the rule

of *lex loci contractus*, applying the substantive law of the state where the contract was formed,

unless there is a choice-of-law provision in the contract.  *Erie Ins. Exch. v. Heffernan*, 399 Md.

598, 925 A.2d 636, 648-49 (2007); *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560,

573, 659 A.2d 1295, 1301 (1995); *see also Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d

1194, 1204 (2015); *Lewis v. Waletzky*, 422 Md. 647, 657 n.8, 31 A.3d 123, 129 n.8 (2011).

Here, the parties seem to assume that Maryland law applies, without discussion.  It appears

that the contract was formed in Maryland, although the parties do not make this expressly clear.  I

shall apply Maryland law.

## C.  Principles of Contract Construction in Maryland

Maryland law is well settled that "the interpretation of an insurance policy is governed by

the same principles generally applicable to the construction of other contracts." *Mitchell v. AARP*,

140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001); *see Connors v. Gov't Emps. Ins. Co.*, 442

Md. 466, 480, 113 A.3d 595, 603 (2015); *Moscarillo v. Prof'l Risk Mgmt. Servs.*, Inc., 398 Md.

529, 540, 921 A.2d 245, 251 (2007); *State Farm Mut. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900

A.2d 208, 225-26 (2006); *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d

995, 1005 (2003).    Accordingly, "'ordinary principles of contract interpretation apply.'"

*Megonnell v. United Servs. Auto. Ass'n*, 368 Md. 633, 655, 796 A.2d 758, 772 (2002) (citation

omitted); *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556, 769 A.2d 948, 957 (2001).

The court bears responsibility for ascertaining the scope and limitations of an insurance

policy.  *See Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 210, 783 A.2d 194, 199 (2001); *Mitchell*

*v. Md. Cas. Co.*, 324 Md. 44, 56, 595 A.2d 469, 475 (1991).  In Maryland, the insured party bears the burden of proving that coverage exists.  *See Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 431 Md. 474, 490, 66 A.3d 615, 624 (2013); *White Pine Ins. Co. v. Taylor*, 233 Md. App. 479, 497, 165 A.3d 624, 633 (2017).  If coverage is established, the burden shifts to the insurer to establish that a certain claimed loss falls within a policy exclusion.  *Beebe-Lee*, 431 Md. at 490, 66 A.3d at 624; *see also Finci v. Am. Cas. Co.*, 323 Md. 358, 593 A.2d 1069, 1087 (1991); *White Pine Ins.*, 233 Md. App. at 497, 165 A.3d at 633.  Because "'exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage.'"  *Megonnell*, 368 Md. at 656, 796 A.2d at 772 (citation omitted).

In "'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.'"  *Universal Underwriters Ins. Co. v. Lowe*, 135 Md. App. 122, 137, 761 A.2d 997, 1005 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)).  The insurance policy, including endorsements, "must be construed as a whole and 'the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution' must be examined."  *United Servs. Auto. Ass'n v. Riley*, 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (quoting *Chantel Assocs. v. Mt. Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 784 (1995)); *accord Clendenin Bros.*, 390 Md. at 459, 889 A.2d at 392; *see Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985); *see also Capital City*, 788 F.3d at 379.  "In general, the main insurance policy and an endorsement constitute a single insurance contract, and an effort should be made to construe them harmoniously."  *Prince George's Cty. v. Local Gov't Ins. Trust*, 388 Md. 162, 173, 879 A.2d 81, 88 (2005).

As the Maryland Court of Appeals has explained, judicial "interpretation of insurance contracts to determine the scope and limitations of the insurance coverage, like any other contract, begins with the language employed by the parties." *MAMSI Life & Health Ins. Co. v. Callaway*, 375 Md. 261, 279, 825 A.2d 995, 1005 (2003). Generally, Maryland courts "analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md. App. at 137, 761 A.2d at 1005; *see Litz v. State Farm Fire & Cas. Co.*, 346 Md. 217, 224, 695 A.2d 566, 569 (1997); *accord Capital City Real Estate, LLC v. Certain Underwriters at Lloyd's*, 788 F.3d 375, 379 (4th Cir. 2015).

Where the insurance policy is unambiguous, the meaning of the terms is determined by the court as a matter of law.  *Clendenin Bros. Inc. v. U.S. Fire Ins. Co.*, 390 Md. 449, 459, 889 A.2d 387, 393 (2006); *see Pa. Nat. Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106, 118 (4th Cir. 2012).  In that circumstance, "'a court has no alternative but to enforce those terms.'" *Megonnell*, 368 Md. at 655, 796 A.2d at 772 (quoting *Dutta*, 363 Md. at 557, 769 A.2d at 1138).

"'If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said.'" *Capital City*, 788 F.3d at 379 (quoting *Perini/Tompkins Joint Venture v. Ace Am. Ins. Co.*, 738 F.3d 95, 101 (4th Cir. 2013)).  In the absence of "an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning.'"  *Md. Cas. Co. v. Blackstone Intern. Ltd.*, 442 Md. 685, 695, 114 A.3d 676, 681 (2015) (quoting *Mitchell*, 324 Md. at 56, 595 A.2d at 475).  However, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding.  *Valliere v. Allstate Ins. Co.*, 324 Md. 139, 142, 596 A.2d 636, 638 (1991) ("When

a policy defines a term in a manner which differs from the ordinary understanding of that term, the policy definition controls."); *see also Dutta*, 363 Md. at 556, 769 A.2d at 957.

A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 306, 753 A.2d 533, 537 (2000). And, if a contractual term is ambiguous, the court may consult "extrinsic sources" to ascertain the meaning. *Id.* at 305, 753, A.2d at 537.

However, a contract is not ambiguous merely because the parties do not agree on its meaning. *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). Rather, a contract is ambiguous "when the language of the contract is susceptible of more than one meaning to a reasonably prudent person." *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444-45 (1999); *see also Cochran v. Norkunas*, 398 Md. 1, 17, 919 A.2d 700, 710 (2007); *Calomiris*, 353 Md. at 436, 727 A.2d at 363.

Maryland courts "'will ordinarily avoid interpreting contracts in a way that renders its provisions superfluous.'" *Calomiris v. Woods*, 353 Md. 425, 442, 727 A.2d 358, 366 (1999) (quoting *State Highway v. Bramble*, 351 Md. 226, 237, 717 A.2d 943, 948 (1998)). The court "cannot accept an interpretation that would nullify" one phrase "to substitute it with a contradictory formulation." *Calomiris*, 353 Md. at 442, 727 A.2d at 366.

Notably, "'unlike the majority of other states, Maryland does not follow the rule that insurance policies are to be most strongly construed against the insurer.'" *Capital City*, 788 F.3d at 379 (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co*., 117 Md. App. 72, 97, 699 A.2d 482, 494 (1997)); *see Megonnell*, 368 Md. at 655, 796 A.2d at 771; *Bushey v. N. Assurance Co. of Am.*, 362 Md. 626, 632, 766 A.2d 598, 601 (2001); *Collier v. MD-Individual Practice Ass'n*, 327 Md. 1, 5, 607 A.2d 537, 539 (1992). But, "if ambiguity is determined to remain after

consideration of extrinsic evidence, 'it will ordinarily be resolved against the party who drafted the contract,' where no material evidentiary factual dispute exists." *Clendenin Bros*., 390 Md. at 459-60, 889 A.2d at 394; *see Callaway*, 375 Md. at 280, 825 A.2d at 1005-06 ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer."). In other words, where ambiguous language remains, the court "construe[s] that language 'liberally in favor of the insured and against the insurer *as drafter of the instrument*.'" *Connors*, 442 Md. at 481-83, 113 A.3d at 603-05 (emphasis in original) (quoting *Megonnell*, 368 Md. at 655, 796 A.2d at 772).

## III.   Discussion

Both parties seek summary judgment on the grounds that there is no genuine dispute as to the facts of the Claim and the Policy is clear and unambiguous.  Baltimore Scrap argues that the Policy unambiguously covers the Claim, while RLI contends that the Policy unambiguously precludes any coverage.  Alternatively, Baltimore Scrap suggests that, if the Court does not agree with its construction of the Policy, then the Policy is ambiguous, and must be construed in its favor, or submitted to the jury for resolution.  ECF 51 at 4.

According to plaintiff, Baltimore Scrap lost covered property, not money, because Grimes "took the scrap he was paid for and removed it from the yard."  ECF 46 at 7.  And, it contends that the Policy clearly covers direct physical losses of property and losses of property that result from fraud and deceit.  *Id.*

Conversely, RLI contends that it is entitled to summary judgment because Grimes took money, not property, and money is unambiguously excluded from coverage under the Policy.  ECF 48-1 at 13.  Alternatively, RLI maintains that, even if the Court finds that Grimes took covered property, the Claim is barred by other provisions of the Policy.  *Id.* at 16.  Further, RLI avers that

each loss is distinct and would be subject to a $25,000 deductible that would exceed the value of the Claim.  *Id.* at 16-17.  Alternatively, RLI maintains that if the thefts are so closely connected as to constitute "an ongoing single theft scheme," then the "the date of loss would predate the RLI Policy," and Baltimore Scrap would be barred from recovery.  *Id.* at 4, 16-18.

As noted, the Policy covers "direct physical loss to covered property at a 'covered location' caused by a covered peril."  ECF 45-5 at 47.  The coverage also extends to "'theft' of covered property" as provided in the "**Fraud and Deceit**" section.  *Id.* at 51.  "[C]overed property," as relevant here, is defined as the company's "business personal property in buildings or structures at a 'covered location' or in the open…on or within 1,000 feet of a 'covered location.'"  *Id.* at 48. However, the Policy expressly provides that money is not covered property.  *Id.* at 50.

The parties vigorously dispute whether Grimes's actions constituted the taking of "covered property" or money from Baltimore Scrap.  ECF 51 at 4; ECF 52 at 1-2.  As I see it, the Policy is not ambiguous.  By its plain language, the Policy only provides coverage for losses to "covered property."  Covered property is clearly defined and expressly excludes money, which is what Grimes obtained from plaintiff.  And, the terms are enforceable as a matter of law.  *Clendenin Bros.*, 390 Md. at 459, 889 A.2d at 393; *Megonnell*, 368 Md. at 655, 796 A.2d at 772.

According to the undisputed facts, on many occasions between March 2011 and October 2014, Grimes entered Baltimore Scrap's scrap yard with a truck loaded with metal, his truck was weighed, and then he would ostensibly drive into the scrap yard to unload the metal.  ECF 46 at 2; ECF 48-1 at 7.  In reality, on repeated occasions, Grimes drove through the yard and out the back gate of the facility to unload the metals off site.  *Id.*  He then drove back into the yard, had his truck weighed without the metal, and collected a cash payment for the amount of metal that he falsely represented to have left inside the yard.  *Id.*  Grimes then left Baltimore Scrap and recovered

22

the metal that he had secretly unloaded off site and continued transporting it for Otis.  ECF 48-4 at 15, Tr. 13-20.

Based on these facts, Baltimore Scrap's argument revolves around the claim that Grimes took "covered property," not money, because he "took the scrap he was paid for and removed it from the yard."  ECF 46 at 7; ECF 46-7 at 3.  However, the plaintiff paints an inaccurate portrait of Grimes's conduct. Grimes falsely represented that he was delivering a certain amount of metal to the scrap yard, but he never actually unloaded any of that metal at the facility. Further, Baltimore Scrap paid Grimes in cash after he had deposited the material off site.

The Court is unaware of any authority directly on point.  But, the Maryland Commercial Law Article provides useful guidance.  Under Md. Code, (2013 Repl. Vol), § 2-401(2) of the Commercial Law Article ("C.L."), "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods…."  And, "[i]f the contract requires delivery at destination, title passes on tender there." *Id.* § 2-401(2)(b).

Baltimore Scrap's employees instructed Grimes to deliver the material in his truck to a specific area in the scrap yard.  ECF 1, ¶ 8; ECF 48-6, ¶ 7.  Therefore, title would have passed from Grimes (or Otis) to Baltimore Scrap upon delivery to that specific area of the facility. However, Grimes never delivered the material to that location.  As a result, title of the goods never passed to Baltimore Scrap.  As such, there was no point during the transaction when the material actually became Baltimore Scrap's covered property at a covered location.

Rather, the material in question was Otis's property and continued to be Otis's property throughout Grimes's fraudulent scheme. ECF 48-6, ¶¶ 4-5; ECF 48-4 at 15, Tr. 13-20.

Accordingly, the material on Grimes's truck cannot be characterized as Baltimore Scrap's property.  And, Grimes obtained money from Baltimore Scrap as part of his scheme.

Indeed, until filing this suit, Baltimore Scrap consistently described Grimes's actions as the theft of money, not property.  During Mr. Burnett's testimony with RLI, he explained: "[N]obody stole inventory. I have to have inventory for somebody to steal. I never got anything. What they got was money."  ECF 48-4 at 31, Tr. 10-13.  He also noted that Grimes "didn't drop off any [material] for the period he was under review."  *Id.* at 47, Tr. 20-21.  Further, he confirmed that "it's [the Baltimore Scrap] position we never received any of this material from Mr. Grimes." *Id.* at 48, Tr. 18-19.  And, during the civil trial in the Circuit Court for Baltimore City, Mr. Ross stated: "I don't believe [Baltimore Scrap] purchased any scrap metal."  ECF 48-5 at 6, Tr. 14-15.

Baltimore Scrap does not provide any alternative theories of coverage for the Court to consider if the loss is considered one of money rather than property.  Instead, Baltimore Scrap lays out the decision for the Court: "If the Court agrees with Baltimore Scrap's assertion that the Loss constitutes a loss of property, then there is coverage.  For RLI to prevail, the Court must find that the nature of the Loss was one solely of money."  ECF 51 at 4.

Because I conclude that Grimes's actions resulted in a loss of money, not property, and money is clearly not covered property under the Policy, RLI did not breach its contract with Baltimore Scrap by denying coverage for the Claim.[5]

## IV.    Conclusion

For the foregoing reasons, I shall deny the Baltimore Scrap Motion (ECF 46) and grant the

---

[5] Because I conclude that Baltimore Scrap's Claim is precluded from coverage because it lost money, not "covered property," I need not consider RLI's alternative arguments for the denial of coverage.  *See* ECF 48-1 at 16-17.

RLI Motion (ECF 48).

An Order follows, consistent with this Memorandum Opinion.


Date: October 9, 2020                    _____/s/_____
                                         Ellen L. Hollander
                                         United States District Judge